STATE OF MAINE
KENNEBEC, SS.

UNIFIED CRIMINAL DOCKET
AUGUSTA
DOCKET NO. CR-2019-2555

STATE OF MAINE

V.

**DECISION ON MOTION TO SUPPRESS**

SARAH VARNEY

## INTRODUCTION

Before the court is the Defendant's Motion to Suppress dated February 6, 2020. The motion as originally filed sought suppression based on: (1) lack of objectively reasonable suspicion; (2) lack of probable cause to arrest, and; (3) violation of *Miranda v. Arizona*. At the evidentiary hearing, however, counsel for the Defendant informed the court that she was only seeking a ruling from the court as the point in time when she was arrested. The State maintains that the Defendant was not arrested until she was told she was arrested at the Gardiner Police Department. The Defendant, on the other hand, contends that she was arrested without probable cause earlier than that, and specifically at least when she was brought to the police station in a cruiser.

The court held a testimonial hearing on the motion on March 3, 2020, at which Officer Alonzo Connor testified. State's Exhibit 1, a DVD disc from Officer Connor's body camera, was admitted into evidence without objection. By

agreement of the parties, the court viewed the DVD at a later time since it is slightly over 4 hours in length.[1]

Based on the evidence presented at the hearing, including the DVD, the court makes the following findings of fact.

## FINDINGS OF FACT

Early in the morning (about 6:00 a.m.) on November 22, 2019, Officer Connor responded to a call from a homeowner in Gardiner. Upon arrival at the scene he found a vehicle in a ditch or gulley on the front lawn of the home. The homeowner complained to Officer Connor that the vehicle had come within a couple of inches of his residence, before it was backed away and ended up in the ditch.

He driver of the vehicle was identified as Sarah Varney of New Hampshire. Ms. Varney was upset and highly emotional, and told Officer Connor that she believed her young son was inside the house because her ex-boyfriend (and father of the child) had told her that. Ms. Varney was also highly confused and appeared to the court from the video to be hyper manic. She had difficulty keeping her balance or following directions.

Officer Connor detected no odor of alcohol from Ms. Varney. She told Officer Connor that she was on the following prescribed medications, which she had taken that day: Aterol, Ativan and Suboxone. She also said that she was prescribed Gabapentin, but it is unclear to the court whether she actually took that medication that day. Officer Connor saw a marijuana pipe and a baggie sticking out of Ms. Varney's pocket and she acknowledged that she took "1 hit" of marijuana about an

---

[1] The court was unable to view the DVD on its court-issued laptop. Counsel for the Defendant then provided the court with a "dropbox" link to the video, but the court could only view a little more than an hour of the video. On that "dropbox" link, there was a counter/timer on the video. Finally, the court was able to watch the entire DVD on its home PC, but the disc did not have a counter/timer on it, at least not one the court could locate.

hour earlier. The court would also note that Ms. Varney's eyes and nostrils appeared wide-open and flared.

Ms. Varney told the officer that she had not slept for 2 ½ days, although later she said she was "into my second day without sleep." She denied having anything to drink. On several occasions she broke out into uncontrollable crying.

Officer Connor attempted to have Ms. Varney perform field sobriety tests (FSTs) and Horizontal Gaze Nystagmus (HGN). Varney had significant difficulty following the officer's directions. She talked about irrelevant things. Officer Connor did not suspect Ms. Varney to be impaired by alcohol, but did suspect that she may have been impaired by drug use.

Ms. Varney was unable to perform the walk and turn despite repeated attempts and repeated instructions from the officer. She stumbled and lost her balance. She complained about her footwear (boots) and insisted that the tarred driveway she was on was "a hill," despite the fact that it appeared to be relatively flat.

At one point, before 25 minutes had passed, Ms. Varney told the officer: "just arrest me." Officer Connor told her she was "not under arrest for anything." Because Ms. Varney complained about the footwear she was wearing, the officer asked if she had other shoes she could wear to perform the field sobriety tests. She tried to put on shoes that were too small for her; she asked if she could walk in diapers; she then put a pair of gloves on her feet to try and perform the walk and turn.

She continued to be unable to follow instructions. The officer told her that he was concerned about her condition and wanted to make sure she was "safe to drive." Ms. Varney complained of the cold and asked non-sensical questions to the officer. Officer Connor gave her several opportunities to perform the FSTs, but Ms. Varney insisted she was walking on a "f------g hill."

3

Another patrolman, Officer Bordelais, conducted HGN with Ms. Varney, but saw nothing that led him to believe she was impaired by alcohol. Nevertheless, the officer was concerned that she was impaired by some other substance because of her inability to comprehend what was being said to her and her manner of acting.

In the meantime, the police, through dispatch, were trying to obtain the services of a tow truck to haul Ms. Varney's vehicle out of the ditch. None were immediately available. At about 40 minutes into the video, Ms. Varney asked if she could do the FSTs somewhere else. The officers also asked if a rescue unit could come to the scene to evaluate Ms. Varney's well-being. When asked, Ms. Varney acknowledged that she could not safely drive back home to New Hampshire.

At approximately 53 minutes into the video, the medics arrived. Ms. Varney sat in the rescue truck to get warm and talk with the EMTs/Paramedics. Her time with the rescue personnel last about 10 minutes. When she stepped out of the rescue vehicle, the tow truck was just arriving. Ms. Varney made further attempts to perform the FSTs, but she continued to have difficulty following directions from the officers. She complained that her boots were too small, she was too cold and the surface was too bumpy. The officers continued to express their concern about allowing her to drive. She was unable to perform the walk and turn or the one-leg stand.

At about this point (and the court was unable to locate any counter or timer on the disc), Officer Bordelais said to Ms. Varney: "Okay, we're going to take a ride back to the P.D. It's warm there." Ms. Varney immediately exclaimed: "Great. I can do it [FST] there." Ms. Varney was patted down for weapons before getting into the back of Officer Connor's cruiser for the short ride back to the station. Once again, Officer Connor explained to Ms. Varney that he was trying to make sure she was safe to drive. If she could successfully perform the FSTs at the station, that

4

would save her the expense of any vehicle impound fees. She replied: "I understand."

At the police department, Ms. Varney was singularly unsuccessful at performing the walk and turn without any footwear on, in a flat hallway. She disclosed for the first time that she had a degenerative disc disorder. She suggested that she could perform the tests better if a "lady" officer were watching her. She could not pay attention. She could not maintain her balance. She could not follow instructions. She giggled for no particular reason. She could not perform the one-leg stand, nearly falling over. She was easily distracted. At around this time, Officer Connor announced that he deemed Ms. Varney not safe to drive her vehicle.

Officer Connor asked Ms. Varney to write out the letters of the alphabet from A-Z and then write down the date and time. The court does not know what Ms. Varney wrote. But a short time later, Officer Connor informed her that she was under arrest. Upon being told this, Ms. Varney became highly emotional, and broke down into loud sobs, which continued off and on for most of the remaining time of the video.

The remainder of the DVD consisted of Ms. Varney performing a breath test on the intoxilyzer and a drug recognition expert (DRE) performing an evaluation/examination of her, ultimately collecting a urine sample from her by consent.

During his testimony, Officer Connor acknowledged that he detected no odor of alcohol or marijuana on Ms. Varney, and did not observe any slurring of speech from her or any clues on HGN. He agreed on cross-examination that he did not believe he had sufficient probable cause to charge Ms. Varney with operating under the influence up until the time she went to the police station.

## DISCUSSION

Ms. Varney argues that she subjected to a *de facto* arrest without probable cause at least at the point in time when she was taken in a police cruiser to the station. The State argues that no arrest occurred until Ms. Varney was formally advised of her arrest by Officer Connor at the Gardiner Police Department. Up until that point, the State contends, Ms. Varney was only subjected to a *Terry*-type investigative detention that was supported by objectively reasonable articulable suspicion.

"There is no bright line distinguishing between investigatory stops, which can be justified by reasonable suspicion, and de facto arrests, which require probable cause." *State v. Flint*, 2011 ME 20, ¶ 9, 12 A.3d 54 *citing State v. Donatelli*, 2010 ME 43, ¶¶ 11-12, 995 A.2d 238, 241-42.

Looking at the totality of the circumstances of Ms. Varney's encounter and interaction with the police, the court concludes that Officer Connor and his colleagues conducted a valid investigatory detention of her to assure themselves that she was safe to operate a motor vehicle. This investigatory detention continued until Ms. Varney was placed under arrest by Officer Connor at the police station. There can be no doubt that the police had reasonable articulable suspicion to detain Ms. Varney until such time as they could satisfy themselves that she was not a danger to herself or the public by operating a motor vehicle.

Officer Connor showed commendable patience with Ms. Varney, whose erratic behavior and frequent mood swings caused him genuine concern for her well-being and the safety of the public should she get behind the wheel of a motor vehicle and attempt to drive back to New Hampshire. He repeatedly instructed her on the field sobriety tests he wanted her to perform and he gave her opportunity after opportunity to perform them. On each occasion, she offered one excuse after another as to why she failed them so miserably – her footwear; the cold; the hilly driveway; her lack of sleep. When Officer Bordelais told her that they would take her back to

the police station where it was warm, Ms. Varney enthusiastically agreed and assured the officers that she could perform the tests there. Indeed, she had earlier asked if she could perform the tests somewhere else.

At the police station, Ms. Varney was still unable to perform the FSTs and consistently lost her balance and her ability to focus on directions. Finally, Officer Connor informed her that she was under arrest for operating under the influence. The court is satisfied that when Officer Connor formally placed Ms. Varney under arrest, he had probable cause to believe that she had operated a motor vehicle while under the influence of intoxicants.

Moreover, the court is satisfied that Officer Connor had probable cause much earlier that morning, namely, from the time he arrived at the scene where Ms. Varney's car was stranded in the ditch and she informed him that she had earlier taken Suboxone, Aterol, Ativan and marijuana. That information, coupled with her highly unusual behavior, would have warranted any reasonable police officer in believing that her mental or physical faculties were impaired by the use of an intoxicant. *Flint*, 2011 ME 20, ¶ 11; *State v. Forsyth*, 202 ME 75, ¶ 10, 795 A.2d 66, 69-70.

As the Law Court has instructed:

> The probable cause standard is flexible and based on common sense. Although requiring more than mere suspicion, probable cause can be satisfied on less than the quantum of proof necessary to establish a fact by a fair preponderance of the evidence. And it is the objective view of the circumstances that matters; the arresting officer's subjective belief regarding whether probable cause exists is not determinative.

*Flint*, 2011 ME 20, ¶ 12.

## CONCLUSION

The entry is:

The Defendant's Motion to Suppress is DENIED.

Dated: April 2, 2020

William R. Stokes
Justice, Superior Court

Entered on the docket 4-3-2020